**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**SECURITIES AND EXCHANGE COMMISSION,**

                                   **Plaintiff,**

v.

**CHRISTINE M. HUNSICKER,**

                                   **Defendant.**

**Civil Action No. 1:25-cv-005897**


**Jury Trial Demanded**

## COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC"), for its Complaint against Defendant Christine M. Hunsicker, alleges as follows:

## SUMMARY

1.      From at least February 2019 through at least March 2025 (the "Relevant Period"), Christine M. Hunsicker ("Hunsicker") – the co-founder, Chief Executive Officer, and Chair of privately-held CaaStle, Inc. ("CaaStle") – created and disseminated to investors false financial statements while raising more than $250 million for CaaStle through the offer and sale of preferred stock and common warrants.

2.      Hunsicker's fake financials supported her narrative that CaaStle, a startup that offered a new monetization model called "Clothing-as-a-Service" to the apparel industry, enjoyed rapid and steady revenue growth after a rebrand of the business in 2018, achieved profitability by December 2022, experienced exponential increases in profitability thereafter, and was nearing an initial public offering or sale. In reality, CaaStle's revenues were shrinking, its losses were increasing, and the company was never profitable.

3.      Throughout the Relevant Period, not a single existing or prospective CaaStle investor received accurate monthly, quarterly, or annual CaaStle financial statements from Hunsicker.

4.      To effect her scheme, Hunsicker took financial reports that she received every month from her financial team and created an alternate set of financials with false monthly, quarterly, and annual results that supported her narrative of the company's success. She provided these falsified financial statements to investors upon request.

5.      By 2022, as CaaStle appeared to be close to reaching profitability, investors increasingly began to ask for audited financial statements. To maintain her ruse, Hunsicker took CaaStle's final signed audit report for fiscal year ended September 30, 2021, downloaded it to her computer, altered the numbers, removed the going concern statement in the audit opinion letter, and provided the falsified audit to investors. After CaaStle's long-time auditor terminated its relationship with CaaStle in 2023, Hunsicker created her own audit reports. She falsified the numbers, audit opinion letters, and notes for the reports covering fiscal years ended September 30, 2022 and 2023, and she forged the former auditor's signature.

6.      Beginning in 2022, Hunsicker also hid from investors the extent to which CaaStle continued to rely on primary capital raises to fund its operations, and she provided capitalization tables that undercounted the number of issued and outstanding shares and that misled investors about CaaStle's true capital structure. Many investors believed that, using CaaStle as a middleman, they were indirectly purchasing discounted shares in secondary transactions from founders, employees, and others who needed liquidity for various personal reasons. Typically, however, these investors were purchasing original issue shares directly from CaaStle. Each CaaStle investor owned a smaller percentage of the company than they realized.

7. Occasionally, Hunsicker herself was the undisclosed seller in secondary transactions, and received for her preferred shares the price at which CaaStle was selling shares in its then-current funding round, not the negotiated discounted price. In other words, Hunsicker orchestrated transactions in which she benefitted herself at the Company's and investors' expense.

8. Hunsicker's scheme began to unravel in late 2024, when multiple investors reviewed CaaStle's falsified 2023 Audit Report in Hunsicker's office and noticed a missing page and several errors inconsistent with the presented document being a final audit report. An investor contacted the audit firm whose name Hunsicker had forged on the report. The firm told the investor that they had not been CaaStle's auditor for years.

9. Hunsicker was forced to resign from CaaStle's Board of Directors on December 14, 2024. But she was temporarily allowed to remain as CaaStle's CEO, with restrictions, including an outright prohibition on her ability to fundraise for CaaStle and sign contracts. Investors were not informed of Hunsicker's actions or departure from the Board while the Board conducted an internal investigation.

10. Hunsicker's wrongdoing continued. Between December 14, 2024 and March 24, 2025, Hunsicker circumvented the Board's restrictions, provided old and new falsified financial statements to CaaStle investors, including for fiscal-year ended September 30, 2024, and engaged in self-dealing transactions in which, among other things, she sold approximately $10 million of her personal shares of CaaStle to existing investors that were unaware of her fraud.

11. Hunsicker formally resigned from her position as CEO on March 24, 2025. The Company began notifying investors on March 25, 2025.

## VIOLATIONS

12.     By virtue of the conduct alleged in this Complaint, Hunsicker violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)].

13.     Unless Hunsicker is restrained and enjoined, she will continue to engage in the transactions, acts, practices, and courses of business set forth in this Complaint or in transactions, acts, practices, and courses of business of similar type and object.

14.     The SEC seeks injunctive relief, disgorgement, prejudgment interest, civil money penalties, an officer and director bar, and other appropriate and necessary equitable relief as to Hunsicker.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action, and venue lies in this District, pursuant to Exchange Act §§ 21(d) and 27 [15 U.S.C. §§ 78u(d) and 78aa], Securities Act § 22(a) [15 U.S.C. § 77v(a)], and 28 U.S.C. § 1331.

16.     Hunsicker, directly or indirectly, made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged in this Complaint. These transactions, acts, practices, and courses of business largely occurred within this District, where Hunsicker's business (CaaStle, Inc.) was located, and where Hunsicker resided and worked during the Relevant Period. Hunsicker offered and sold securities to investors located worldwide, including investors located within this District.

## DEFENDANT

17.     Christine M. Hunsicker, age 48, resides in Lafayette, New Jersey and New York, New York. She is the co-founder of Gwynnie Bee, Inc., which was later renamed CaaStle, Inc. Hunsicker was Chair of CaaStle's Board of Directors until December 14, 2024, and its CEO until March 24, 2025. Hunsicker was the public face of CaaStle. Her principal responsibilities were business strategy and raising funds.

## RELEVANT NON-PARTY

18.     CaaStle, Inc. is a privately-held Delaware corporation headquartered in New York, New York. During the Relevant Period, CaaStle had distribution centers in Ohio and Arizona, and a wholly-owned subsidiary that employed hundreds of employees in New Delhi, India.

19.     Hunsicker co-founded CaaStle under the name Gwynnie Bee, Inc. in 2011. The company commenced operations in 2012 and initially offered a direct-to-consumer rental subscription service focused on apparel for plus-sized women.

20.     Commencing in 2017, Hunsicker scaled the business and began offering Gwynnie Bee's underlying technology and logistics services to third-party apparel brands and retailers, enabling those brands and retailers to offer a rental subscription service to their own customers.

21.     In November 2018, Hunsicker changed the company's name to CaaStle, Inc. as part of a corporate rebranding of CaaStle as a "Clothing-as-a-Service" or "CaaS" company. Since then, CaaStle has operated as a business-to-business technology and logistics company that, through its platform, enables apparel brands and retailers to offer customers subscription-based rentals of apparel, with the option to buy. Brands and retailers pay CaaStle a fee to use CaaStle's proprietary technology (including algorithms and analytics), reverse logistics (shipping, garment care), and infrastructure (customer service).

22. Throughout the Relevant Period, CaaStle's Head of Finance, who was based in New Delhi, India, oversaw the company's book-keeping, accounting, financial planning, and treasury functions. CaaStle's Financial Controller was based in New York and reported to the Head of Finance.

23. Throughout the Relevant Period, CaaStle's financial statements were audited by an independent outside audit firm. AUDITOR 1 audited CaaStle's financial statements for fiscal years ending September 30, 2013 through September 30, 2021. AUDITOR 2 audited CaaStle's financial statements for fiscal years ending September 30, 2022 through September 30, 2023.

24. For all audited years, the auditors issued "clean" audit opinions, *i.e.*, audit opinions finding that the consolidated financial statements prepared from CaaStle's internal books and records systems presented fairly, in all material respects, the company's financial position at fiscal-year end, in accordance with U.S. Generally Accepted Accounting Principles ("US GAAP"). For all audited years, the audit report was accompanied by a statement expressing substantial doubt as to CaaStle's ability to continue as a going concern in light of its recurring losses from operations, and reliance on future additional debt or equity financing to fund operations.

25. Substantial doubt to continue as a Going Concern is an accounting concept that "relevant conditions and events, considered in the aggregate, indicate that it is probable that an entity will be unable to meet its obligations as they become due within one year after the date that the financial statements are issued." (ASC 205-40-50-4).

26. Throughout the Relevant Period, CaaStle had a three-member Board of Directors. Hunsicker was the sole inside director. The other two were independent directors – one based on the West Coast, and the other in Japan. The Board generally met by videoconference twice a year. The Head of Finance and Financial Controller did not attend Board meetings or otherwise interact

with or provide financial statements or financial information to CaaStle's Board of Directors. The Board received financial information about the Company exclusively from Hunsicker during the Relevant Period, until December 2024, but the information they received did not comport with the information reflected in CaaStle's internal records.

27.     On June 20, 2025, CaaStle filed a petition for Chapter 7 Bankruptcy. *See* Case No. 25-11187 (D. Del. Bankr. June 20, 2025).

**FACTS**

I.     **Hunsicker Knowingly Created and Distributed to Investors
Materially False Unaudited and Audited Financial Statements**

A.     **Hunsicker's Knowledge of CaaStle's True Financial Performance**

28.     Hunsicker routinely received financial information from CaaStle's finance team and, through her involvement in the company's budgeting process, and her receipt of interim and annual internal financial reports, and draft and final audit reports, knew or was reckless or negligent in not knowing of CaaStle's true financial performance and reliance on primary capital raises.

29.     Hunsicker reviewed and approved CaaStle's annual budget each year. The annual budgets for fiscal years 2019 through 2024 all anticipated large income shortfalls due to low revenues and high costs. The company relied on Hunsicker to fill the gap between revenue and costs by raising capital.

30.     On a monthly basis, Hunsicker received from CaaStle's Financial Controller or someone acting under her direction, the company's month-end balance sheet and income statement, which included year-to-date data for all prior months in the fiscal year.

31.     Hunsicker also received a monthly management packet. The packet typically included monthly financial statements and was stored on a shared drive to which Hunsicker had access.

32.     At the conclusion of every audit, Hunsicker received from CaaStle's Financial Controller or Head of Finance a copy of CaaStle's final signed audit report. She also periodically requested and received drafts of CaaStle's audit reports.

**B.      Hunsicker Doctored and Provided to Investors
         <u>Materially False Financials for Fiscal Years Ended 2018 through 2023</u>**

33.     By no later than February 2019, three months after Hunsicker rebranded the company and changed its name to CaaStle, Hunsicker began to create and disseminate to current and prospective CaaStle investors materially false financial statements in connection with her capital-raising efforts for CaaStle.

34.     Hunsicker provided materially false financial statements to investors for approximately 6 years, during which time CaaStle raised more than $250 million in capital from investors who were unaware that the financial information they received was entirely a fiction.

35.     Throughout that time, investors routinely asked for financial statements as part of their original and continuing due diligence on the company. Some required financial statements because their own financial statements were audited and their auditors needed to value their holdings in CaaStle. Accurate financial statements were important to investors.

36.     As alleged in further detail below, in early 2019, Hunsicker's falsified financial statements for fiscal year ended September 30, 2018, reported gross annual revenues of $71.5 million, a 187% inflation of CaaStle's actual gross revenues, which were $24.9 million. The discrepancy between Hunsicker's misstated financial results and the company's actual results continued to grow in magnitude year-over-year, as reflected in the below chart:

| Revenue Overstatement | | | | | | | |
|---|---|---|---|---|---|---|---|
| Fiscal Year (through FYE 9/30) | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 (unaudited) |
| False Revenues Created by Hunsicker (in millions) | $71.5 | $89.8 | $93.3 | $120.5 | $238.5 | $439.9 | $838 |
| Actual CaaStle Revenues (in millions) | $24.9 | $26 | $24.9 | $18.6 | $19.7 | $15.7 | $11.3 |
| **Overstatement Percentage** | **187%** | **245%** | **275%** | **548%** | **1,110%** | **2,702%** | **7,315%** |

| Loss Understatement/Profit Overstatement | | | | | | | |
|---|---|---|---|---|---|---|---|
| Fiscal Year (through FYE 9/30) | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 (unaudited) |
| False Profits/(Losses) Created by Hunsicker (in millions) | (24.1) | ($27.7) | ($29.9) | ($33.7) | ($17.1) | $66.3 | $192.2 |
| Actual CaaStle Profits/(Losses) (in millions) | ($53.6) | ($57.5) | ($45) | ($32.3) | ($55.8) | ($81) | ($59) |

37. At all times, Hunsicker was the sole CaaStle employee to communicate with and provide financial information to investors. Her finance team, including CaaStle's Head of Finance and Financial Controller, did not provide financial statements to investors.

**i.      Hunsicker Falsified CaaStle's Fiscal 2018 Financials**

38. By no later than January 22, 2019, as part of their monthly review of CaaStle's financial results, Hunsicker's finance team provided Hunsicker with the company's then-current unaudited income statement for the full fiscal year ended September 30, 2018 ("Fiscal Year 2018"), generated from CaaStle's internal records. These internal records reflected fiscal 2018 revenues of $23.4 million, operating losses of $46.6 million, and net losses of $55.6. Hunsicker also had access to this information on the company's shared drive.

39. Despite having access to company internal records, on February 24, 2019, Hunsicker emailed a prospective investor, who had been asking for financials for months, a document that she herself created. The document purported to be CaaStle's fiscal 2018 income statement but instead was a fake. It reflected revenues of approximately $71.5 million and operating losses of approximately $24.1 million for the fiscal year.

40. Hunsicker subsequently provided the same fake fiscal 2018 income statement to at least nine other investors. Some of them invested for the first time or added to their investments after receiving these false financials.

41. For example, between May 13 and June 16, 2019, Hunsicker provided an investor with multiple copies of the fake 2018 income statement, along with other falsified interim period financials and projections. On June 27, 2019, the investor signed a stock purchase agreement, and on June 28, 2019, the investor wired $2 million to purchase CaaStle Series A-11 preferred shares.

42. Hunsicker knew or was reckless or negligent in not knowing the fiscal 2018 numbers she provided to investors were materially false and did not reflect the information in CaaStle's internal system of records.

43. Hunsicker later received a copy of CaaStle's final audit report for Fiscal Year 2018, which AUDITOR 1 completed and CaaStle's finance team sent to her on February 7, 2020. The audited income statement reported revenue of approximately $24.9 million and operating losses of approximately $53.6 million for Fiscal Year 2018, which largely comported with the unaudited internal financial records that Hunsicker had received from her finance team. The audited financial statements were accompanied by a clean audit opinion with AUDITOR 1's conclusion that CaaStle's Fiscal Year 2018 financial statements presented fairly, in all material respects, CaaStle's financial position in accordance with US GAAP.

44.     CaaStle's Fiscal Year 2018 audit report confirmed to Hunsicker the falsity of the fiscal 2018 financial statements that she sent to investors. She did not send the Fiscal Year 2018 audit report to any investors, provide investors with corrected fiscal 2018 financial information, or tell investors that the fiscal 2018 financial information they received from her was inaccurate.

## ii.     Hunsicker Falsified CaaStle's Fiscal 2019 Financials

45.     By no later than November 11, 2019, Hunsicker's finance team emailed her the company's then-current unaudited income statement for the full fiscal year ended September 30, 2019 ("Fiscal Year 2019"), generated from CaaStle's internal records. These internal records reflected fiscal 2019 revenues of approximately $27.7 million, operating losses of approximately $54.4, and net losses of approximately $57 million. Hunsicker also had access to this information on the company's shared drive.

46.     Despite her access to the company's internal records, on April 19, 2020, after an existing investor asked for an update of the business, Hunsicker created and emailed the investor what purported to be CaaStle's fiscal 2019 income statement. The income statement was a fake that Hunsicker herself created. The income statement reflected revenue of approximately $89.8 million and operating losses of approximately $27.7 million for the fiscal year.

47.     Hunsicker subsequently provided her fake fiscal 2019 income statement to least six other CaaStle investors, knowing that they were materially wrong. Some of them invested for the first time or added to their investments after receiving these financials.

48.     Hunsicker knew or was reckless or negligent in not knowing that that the fiscal 2019 income statement did not reflect the information in CaaStle's internal system of records.

49.      Furthermore, on August 4, 2020, Hunsicker received a copy of CaaStle's final audit report for Fiscal Year 2019, which AUDITOR 1 completed and signed on the same date. The

audited financial statements reported revenue of approximately $26 million and operating losses of approximately $58.2 million for Fiscal Year 2019, which largely comported with the unaudited internal financial records that Hunsicker received from her finance team.

50.     CaaStle's Fiscal Year 2019 audit report confirmed to Hunsicker the falsity of the fiscal 2019 financial statements that she sent to investors. She did not send the Fiscal Year 2019 audit report to any investor, or provide any investor with corrected fiscal 2018 financial information, or tell any investor that the information she had previously sent was materially inaccurate. She instead continued to send her doctored fiscal 2019 income statement to investors

51.     Yet, on September 7, 2020, Hunsicker provided an investor with a copy of the fake 2019 income statement. The investor signed a stock purchase agreement and warrant purchase agreement on November 6, 2020. The next day, the investor wired $1.5 million to CaaStle to purchase CaaStle Series A-11 preferred shares and common warrants.

### iii.     Hunsicker Falsified CaaStle's Fiscal 2020 Financials

52.     By no later than November 24, 2020, Hunsicker's finance team provided her with CaaStle's then-current unaudited income statement for the full fiscal year ended September 30, 2020 ("Fiscal Year 2020"), generated from CaaStle's internal records. These internal records reflected fiscal 2020 revenue of approximately $24.7 million, operating losses of approximately $42.6 million, and net losses of approximately $44.9 million. Hunsicker also had access to this information on the company's shared drive.

53.     By March 6, 2021, Hunsicker created and emailed to an existing investor a document that purported to be CaaStle's fiscal 2020 income statement. The income statement was a fake that Hunsicker herself created. It reflected revenue of approximately $93.3 million and operating losses of approximately $29.9 million for the fiscal year.

54.     Hunsicker subsequently provided the same fake fiscal 2020 income statement to at least ten other CaaStle investors. Some of them invested for the first time or added to their investments after receiving these financials.

55.     For example, on April 19, 2021, Hunsicker emailed an existing investor a copy of the fake 2020 income statement and a slide deck on the company, in response to his standing request that Hunsicker keep him better informed and provide more regular financial updates. On August 9, 2021, Hunsicker emailed the investor to inform him that the company was looking to raise $15 million to $20 million in additional capital, and wrote, "I would love for you to do some more." The investor signed a stock purchase agreement and wired $2 million to CaaStle on August 20, 2021, for the purchase of CaaStle Series A-12 preferred shares.

56.     Hunsicker knew or was reckless or negligent in not knowing that the fiscal 2020 numbers she sent to investors were materially false and did not reflect the information in CaaStle's internal system of records.

57.     On May 24, 2021, Hunsicker received a copy of CaaStle's final audit report for Fiscal Year 2020, which AUDITOR 1 completed and signed on the same date. The audited financial statements reported revenue of approximately $25 million and operating losses of approximately $45.3 million for fiscal year 2020, which largely comported with the internal reports received by Hunsicker received from her finance team. The audited financial statements were accompanied by a clean audit opinion with AUDITOR 1's conclusion that CaaStle's Fiscal Year 2020 financial statements presented fairly, in all material respects, CaaStle's financial position in accordance with US GAAP.

58.     CaaStle's Fiscal Year 2020 audit report confirmed to Hunsicker the falsity of the fiscal 2020 financial statements that she sent to investors. She did not send the Fiscal Year 2020

audit report to any investor, or provide any investor with corrected fiscal 2020 financial information, or tell any investor that the information she had previously sent was materially inaccurate. Indeed, she continued to send her doctored fiscal 2020 income statement to investors.

#### iv.    **Hunsicker Falsified CaaStle's Fiscal 2021 Financials and Audit Report**

59.    In late 2021, shortly after the close of fiscal year ended September 30, 2021 ("Fiscal Year 2021"), one of CaaStle's earliest investors told Hunsicker that they would not commit additional investment funds to CaaStle, unless the company started to provide audited financials and to provide financial updates more regularly. Other investors inquired about when CaaStle would have audited financials as well. Hunsicker began to tell investors that CaaStle would have audited financials in 2022.

60.    On February 22, 2022, AUDITOR 1 completed its audit for CaaStle's Fiscal Year 2021 and Hunsicker received a copy of the final audit report that day. AUDITOR 1 completed CaaStle's audit on a more accelerated timeline that year than in prior years. The audited financial statements reported Fiscal Year 2021 revenues of approximately $18.6 million and operating losses of approximately $32.3 million, which also largely comported with the unaudited internal financial records that Hunsicker earlier received from her finance team. The audited financial statements were accompanied by a clean audit opinion with AUDITOR 1's conclusion that CaaStle's Fiscal Year 2021 financial statements presented fairly, in all material respects, CaaStle's financial position in accordance with US GAAP.

61.    The Fiscal Year 2021 audit report did not comport with the narrative that Hunsicker had been telling investors. Therefore, consistent with her handling of prior fiscal year audit reports, Hunsicker did not send the Fiscal Year 2021 audit report to any investor.

62.     When investors inquired about the status of the Fiscal Year 2021 audit in 2022, Hunsicker provided different excuses for the delay, to buy herself time. On June 22, 2022, four months after AUDITOR 1 issued its final audit report, Hunsicker told one investor that CaaStle was still in the process of engaging an auditor. As 2022 progressed, Hunsicker told investors that, as a private company, CaaStle was not high on the auditor's priority list, and the audit was slow-going and not complete. Investors began to express concern about the audit delays.

63.     Hunsicker ultimately decided, after having told investors that they can expect to see audited financials in 2022, to falsify CaaStle's Fiscal Year 2021 audit report to provide a falsified audit to investors.

64.     On or around November 30, 2022, Hunsicker asked her finance team to locate a non-final draft of the Fiscal Year 2021 audit report. The finance team did not ask why she wanted a draft and, on November 30, 2022, emailed Hunsicker a draft in Word, with a note that it was the latest draft they could locate. Hunsicker took the draft, altered the numbers to support her narrative, changed the audit opinion letter to remove the going concern opinion, and then added the words 12/2/2022 DRAFT to the front page before sending a PDF copy to the investor.

65.     On December 2, 2022, Hunsicker emailed an investor what purported to be a draft of the Fiscal Year 2021 audit report. She lied to the investor and told him that CaaStle's accounting team and the auditor were still "turning versions" of the audit report but that the draft was "further along than [she] expected." The draft contained an income statement that reflected revenue of approximately $120.5 million for the fiscal year – a material improvement over the prior fiscal year – and operating losses of $33.7 million. The draft contained a balance sheet that reflected a cash balance of approximately $30.2 million as of September 30, 2021. These numbers were materially false and not reflective of CaaStle's internal records.

66.    Between December 2022 and March 2023, Hunsicker provided the falsified draft Fiscal Year 2021 audit report to at least eight CaaStle investors, though she knew or was reckless or negligent in not knowing that the draft was a complete fake and that the financial information reflected in it was materially false.

67.    From March 2023 through at least August 2023, Hunsicker emailed at least 15 investors what purported to be a final Fiscal Year 2021 audit report. The "final" too was a fake that reflected financial performance data similar to what had been reflected in the "draft" – materially overstated revenues of approximately $120.5 million, operating losses of approximately $33.7 million, and a materially inflated cash balance of approximately $30.3 million as of September 30, 2021. Hunsicker changed the numbers, removed the auditor's going concern opinion, and inserted AUDITOR 1's signature onto the doctored audit opinion letter. She dated the opinion letter as of March 26, 2023, making it appear that AUDITOR 1 had just completed the audit and finalized the report.

68.    Hunsicker knew or was reckless or negligent in not knowing that the Fiscal Year 2021 audit report had been finalized and signed by AUDITOR 1 ten months earlier and that "draft" and "final" versions she created and sent to investors were complete fakes and materially misstated CaaStle's true financial performance.

v.    **Hunsicker Falsified CaaStle's Fiscal 2022 Financials and Audit Report**

69.    In March 2023, Hunsicker announced to investors that CaaStle had generated a profit and become cash flow positive for the first time in the quarter ending December 31, 2022. She supported her statement by providing investors with a false interim financial statement that was not reflective of CaaStle's internal financial records. CaaStle, in fact, had not become profitable or cash flow positive by December 2022.

70.     Hunsicker's announcement increased the appetite of CaaStle investors for audited financial statements, which Hunsicker appeased by creating a fake draft audit report with fake financial statements and fake notes for fiscal year ended September 30, 2022 ("Fiscal Year 2022"), and then creating a fake final Fiscal Year 2022 audit report, to which she added AUDITOR 1's signature.

71.     On April 4, 2023, Hunsicker emailed two existing and prospective investors what purported to be an April 3, 2023 draft of the Fiscal Year 2022 audit report. She told the investors that CaaStle's auditor was working through "presentation issues," completing its audit of the capitalization table, and finalizing the notes, suggesting that the financial statements in the draft report were near-final or final. In reality, the draft was a fake created by Hunsicker herself. The income statement reflected revenue of approximately $238.5 million for the fiscal year, nearly double the amount that had been reflected in the fake Fiscal Year 2021 audit report. The balance sheet reflected a cash balance of approximately $42.5 million as of September 30, 2022. These numbers did not comport with CaaStle's internal records. The accompanying audit opinion letter and notes were devoid of any reference to CaaStle as a going concern.

72.     One day after receiving Hunsicker's falsified "draft" of the Fiscal Year 2022 audit report, a prospective investor that had tracked CaaStle's fake financial performance for years, sought authorization from its investment committee to commit $7.5 million to purchase shares of CaaStle's Series A-12 preferred stock and common warrants. The false data that Hunsicker sent to the investor – including fake fiscal 2021 and 2022 financial data – was important to the investor's decision-making process. The investor signed a stock purchase agreement, a warrant purchase agreement, and other transactional documents, and wired $7.5 million to CaaStle's bank account on April 11, 2023.

73. From September 2023 through at least March 2024, Hunsicker provided at least 10 investors with a document that purported to be a final Fiscal Year 2022 audit report. The document reflected false financial performance data similar to what had been reflected in the "draft" – materially overstated revenues of approximately $238.5 million that were nearly double that of the prior year, operating losses of approximately $17.1 million that were nearly half of the prior fiscal year, and a materially inflated cash balance of approximately $42.5 million as of September 30, 2022. Hunsicker cut and pasted into the document AUDITOR 1's signature from a prior year's audit report. Like the fake draft, Hunsicker's fake final Fiscal Year 2022 audit report did not express warnings about CaaStle's ability to continue as a going concern or its need to continue to raise capital to continue as a going concern.

74. Hunsicker knew or was reckless or negligent in not knowing that the financial information reflected in the draft and final Fiscal Year 2022 audit reports that she provided to investors was materially false and did not comport with CaaStle's internal records. While creating the false reports, she was in possession of the internal financial statements and records that her finance team sent earlier. The internal records reflected fiscal 2022 revenues of approximately $20 million, operating losses of approximately $34.1 million, and net losses of approximately $40 million, and a September 30, 2022 cash balance of approximately $621,000.

75. Hunsicker also knew when she sent the fake draft and final Fiscal Year 2022 audit reports that: (a) CaaStle was experiencing a severe cash crunch and had instructed AUDITOR 1 to stop working on CaaStle's Fiscal Year 2022 audit in September 2023 and (b) AUDITOR 1 had terminated its relationship with CaaStle in early October 2023 in a written letter addressed to Hunsicker.

76. CaaStle's new auditor, AUDITOR 2, completed the Fiscal Year 2022 audit on December 2, 2024. The audited financial statements reported fiscal year 2022 revenues of approximately $19.7 million and operating losses of approximately $58.5 million, and a cash balance of less than $750,000 as of September 30, 2022. These numbers were materially consistent with the internal reports that Hunsicker had received before sending her falsified fiscal 2022 financials to investors.

77. The audit report was accompanied by a clean audit opinion with AUDITOR 2's conclusion that CaaStle's financial statements for Fiscal Year 2022 presented fairly, in all material respects, CaaStle's financial position in accordance with US GAAP. The audit report noted that that "[CaaStle] has suffered recurring losses from operations and requires additional debt or equity financing in the future to continue to fund its operations, which cannot be guaranteed. These factors raise substantial doubt about its ability to continue as a going concern."

78. Hunsicker received a copy of the final audit report on December 2, 2024. She did not send the report to any investors or provide investors with corrected fiscal year 2022 financial information.

### vi. Hunsicker Lied to Cover Her Tracks Relating to CaaStle's Fiscal 2022 Financials and Audit Report

79. Hunsicker's scheme nearly unraveled in October 2023 before she sent misleading financial statements to any investor for the fiscal year ended September 30, 2023. Her lies kept the scheme alive for over one more year.

80. In September 2023, an investor who received the fake Fiscal Year 2022 audit report from Hunsicker noticed errors in the report that suggested it might not be final. The investor emailed the fake report to AUDITOR 1 and asked if AUDITOR 1 had "conducted and completed" the audit for Fiscal Year 2022. AUDITOR 1 told the investor that the report was "not signed by

[AUDITOR 1]" and was "not a legitimate [AUDITOR 1] opinion." AUDITOR 1 contacted CaaStle's Head of Finance and Financial Controller and Hunsicker. Hunsicker explained that this was a one-off error. She claimed that she had mistakenly sent the investor a marked up version of the audit report that she intended to use in a lecture she was giving at Princeton University on ethics and entrepreneurship.

81.     AUDITOR 1 terminated its relationship with CaaStle on October 3, 2023. Although skeptical of Hunsicker's story, AUDITOR 1 did not report her to the Board of Directors. CaaStle's Head of Finance and Financial Controller believed Hunsicker's excuse and also did not report her to the Board of Directors. CaaStle redeemed the investor's shares at cost, and the investor did not report Hunsicker to the Board of Directors.

82.     Although Hunsicker took out personal loans and provided the proceeds to CaaStle to enable it to redeem the investor's shares, the loans came from CaaStle investors who were misled about how she intended to use the loan proceeds. She ultimately repaid a majority of the loans by selling some of her personal shares of CaaStle preferred stock to an investor who had received false financials from her and was unaware of her fraud. The investor forgave his own $4 million loan to Hunsicker and then paid an additional $3.5 million purportedly to purchase $7.5 million some of her personal shares at a discounted price. She attempted to repay the rest of her personal loans by wiring funds from CaaStle's bank account to the investor-lender, who has since returned the funds to CaaStle, and insisted that Hunsicker pay the loan from her personal funds.

83.     With the Board of Directors unaware of Hunsicker's actions, or the real reason why AUDITOR 1 had terminated its relationship with CaaStle, Hunsicker continued her scheme.

84.     Exactly two business days after AUDITOR 1 terminated its relationship with CaaStle, Hunsicker sent to a long-term CaaStle investor the fake Fiscal Year 2022 final audit report

that AUDITOR 1 had denounced. The investor purchased additional shares of CaaStle's A-12 preferred stock and common warrants days later for its own account and an account held for the benefit of a client for over $2.5 million.

85.     In March 2024, Hunsicker sent the fake Fiscal Year 2022 audit report to another existing CaaStle investor. In April 2024, the investor purchased more than $15 million additional preferred shares and common warrants for itself and a group of co-investors.

<h3 align="center">vii.     <u>Hunsicker Falsified CaaStle's Fiscal 2023 Financials and Audit Report</u></h3>

86.     On September 24, 2024, as part of her continuing efforts to raise capital for CaaStle, Hunsicker gave an investor access to a data room that contained a purported final audit report for fiscal years ended September 30, 2022 and 2023. The document was a fake created by Hunsicker. The financial statements reflected fiscal 2023 revenues of approximately $439.9 million, total profits of approximately $66.3 million, and a cash balance of approximately $112.8 million as of September 30, 2023, which did not comport with CaaStle's internal records.

87.     Hunsicker knew or was reckless or negligent in not knowing that the fiscal 2023 financial information reflected in the audit report was materially false and did not comport with CaaStle's internal records.

88.     CaaStle's true Fiscal Year 2023 financial performance was dismal in comparison. CaaStle's internal records – which Hunsicker had received from her finance team beforehand – reflected fiscal 2023 revenues of approximately $15.6 million, operating losses of approximately $39.6 million, net losses of approximately $47.2 million, and a September 30, 2023 cash balance of approximately $880,000.

89.     Hunsicker also knew when she sent the fake Fiscal Year 2022-2023 audit report to investors that AUDITOR 2 had not completed its fiscal 2023 audit yet. She drafted the report. She

cut and pasted AUDITOR 1's signature into the report from a prior audit. She scanned the document to herself.

90.     The fake Fiscal Year 2022-2023 audit report contained multiple facial errors. It was missing page 7, the stockholders' equity report; the notes were out-of-date; and the audit opinion letter purported to be signed by AUDITOR 1 on August 30, 2024.

91.     Within days of receiving the fake Fiscal Year 2022-2023 audit report from Hunsicker, the investor described in Paragraph 86 wired more than $25 million to CaaStle to purchase preferred shares and common warrants.

92.     Several weeks later, Hunsicker offered two different investors an opportunity to view the supposed final Fiscal Year 2022-2023 audit report in her office. Both investors accepted the offer. They were shown the same fake audit report that Hunsicker had loaded to the data room on September 24.

93.     AUDITOR 2 completed CaaStle's Fiscal Year 2023 audit on December 2, 2024, and issued it as a joint Fiscal Year 2022-2023 Audit Report. The audited financial statements reported fiscal 2023 revenues of approximately $15.7 million, operating losses of approximately $80.7 million, and a cash balance of less than $950,000 as of September 30, 2023. These numbers were materially consistent with the internal reports that Hunsicker had received from her finance team before sending falsified fiscal 2023 financials to investors, except for the audited loss figure which was materially larger in comparison to the company's internal records.

94.     CaaStle was not profitable or cash-flow positive in Fiscal Year 2023. Nor was it financing operations from its own cash flow. It had less than $1 million in cash and had suffered its largest losses to date. The real Fiscal Year 2022-2023 audit report noted that that "[CaaStle] has suffered recurring losses from operations and requires additional debt or equity financing in

the future to continue to fund its operations, which cannot be guaranteed. These factors raise substantial doubt about its ability to continue as a going concern." This is the same message that previously appeared in every one of CaaStle's "real" audit reports.

## II. Hunsicker Procured Investments Using Misleading Sales Tactics

95. By mid-2022, Hunsicker also hid from investors the extent to which CaaStle continued to rely on primary capital raises to fund its operations, and she provided capitalization tables that misled investors about CaaStle's true capital structure. Investors who wanted to participate in secondary transactions ended up mostly participating in primary offerings, and investor interests were diluted as a result.

96. Prior to 2022, CaaStle raised capital by selling original issue common shares and successive rounds of preferred shares to investors. By late 2021, Hunsicker began to tell investors that CaaStle had largely completed its capital-raising rounds and was moving into a final "pre-IPO round." By July 2022, she told investors that CaaStle was close to "generating cash" and may not have another capital-raising round. The false financial statements she provided to investors in March 2023 fit her inaccurate narrative and falsely represented that CaaStle had become profitable and cash flow positive by December 31, 2022, and was capable of generating sufficient revenue to independently fund its operations without the need for primary capital raises. CaaStle's fake Fiscal Year 2022-2023 audit report represented that CaaStle had not raised capital since the end of fiscal 2022.

97. In reality, CaaStle's financial performance had worsened, and CaaStle relied on Hunsicker's continued ability to raise capital in order to survive. Investors were unaware of this fact. Several investors only invested because they believed they were buying discounted shares in secondary transactions. If they had known that CaaStle was continuing to raise capital – when its

balance sheet suggested that CaaStle has cash-rich – that information would have influenced their investment decision.

98. Hunsicker structured the supposed "secondary transactions" in a manner that allowed her to conceal the true nature of the transactions as a primary capital-raising events. She told prospective buyers that she was facilitating resales from early investors in CaaStle who were facing liquidity issues or other requirements to sell their shares. Then, acting as intermediary, she purported to negotiate the transaction on behalf of both sides. The buyers had no contact with the supposed sellers. The buyers executed transactional documents with CaaStle and wired funds to CaaStle, and CaaStle was supposed to use the proceeds to purchase shares from the seller.

99. The selling investors that Hunsicker described, for the most part, did not exist. The majority of the shares sold in purported secondary transactions were newly issued CaaStle shares. CaaStle used the funds for operations.

100. For example, on August 16, 2023, Hunsicker solicited a prospective investor, telling him she had "an employee who desperately needs some liquidity for an elder care situation." Hunsicker told the prospective investor that CaaStle would act as middleman by purchasing the shares from the employee and then selling shares to the investor. The selling employee that Hunsicker described did not exist. The buyer purchased one million shares, believing the shares would come from reissuances of previously issued shares. CaaStle then issued a mix of new preferred and common shares to the buyer. The investor's new shares increased the number of outstanding shares by one million, as reflected on CaaStle's internal capitalization table. Hunsicker made the same offer concerning the same fictitious seller to multiple other investors, several of whom purchased shares in transactions that CaaStle recorded as original share issuances.

101. Occasionally, Hunsicker herself was the seller in a secondary transaction, though she concealed her identity from the buyer, and CaaStle paid her full price to redeem her shares, not the negotiated discounted price paid by the buyer.

102. For example, on July 25, 2022, Hunsicker emailed an existing CaaStle investor with an opportunity to purchase shares from another CaaStle investor who she claimed had become a director of a large Chinese public company and was being pushed by the "[C]hinese gov[ernmen]t … to sell his US tech stocks." Hunsicker told the investor that "because [the seller] is getting pressure, he's willing to do a substantial discount on his shares" at a price of $2.05 per share, which Hunsicker described as a 67% discount to the price at which CaaStle sold shares in its last fundraising round. A day later, after the investor stated that he needed time to determine how much he could invest, Hunsicker told the investor that the seller would be willing to sell 25% of his available shares to the investor for $1.50 per share. Hunsicker then pressured the investor to act, telling him that CaaStle would likely not do another funding round "since we are so close to generating cash." Hunsicker also sent the investor false income statements covering the period January through June 2022 and a false balance sheet as of June 30, 2022.

103. The investor agreed to purchase the shares at $1.50 per share and wired approximately $500,000 to CaaStle the next day. CaaStle recorded it as paid in capital. CaaStle then purchased preferred shares from Hunsicker, not an executive of a Chinese public company, and it paid her $6.20 per share, not $1.50.

104. Hunsicker made the same offer to sell shares from the same fictitious investor to multiple other investors. One of them purchased shares in a transaction that the company recorded as an original share issuance. The proceeds from that sale were not used to repurchase shares from Hunsicker or any other real selling investor. CaaStle used the funds for operations.

105.     To hide that these transactions were capital raises and not true secondary sales, Hunsicker created and distributed false capitalization tables that omitted the new share issuances and made it appear that outstanding share levels remained flat. For example, in response to a January 1, 2024 request from an existing investor for the capitalization table, Hunsicker provided a table that undercounted the outstanding shares at the time by more than 50 million shares (out of approximately 260 million). The table showed the amount of shares that the investor expected.

106.     Hunsicker further deceived the investor with her explanation that "[t]he changes from the last cap table are: Your investments, retiring common shares, option grants during our annual cycle and options that have exercised to common." The changes Hunsicker mentioned amounted to negligible sums. Hunsicker omitted mention of any new share issuances from capital raising in her statement.

107.     CaaStle's records show that, between December 2021 and July 2023, Hunsicker was the only shareholder on the sell side of a secondary transaction, redeeming a total of approximately 675,000 shares, for which CaaStle paid her $6.20 per share, or more than $4 million.

108.     CaaStle's records also show that, in the aggregate, between January 2022 and December 2024, CaaStle raised capital through the sale of 100 million newly issued CaaStle shares. These issuances caused CaaStle to exceed the number of authorized share totals in 2023. The Board of Directors later purportedly retroactively increased the number of authorized outstanding shares of common stock from 255 million to 350 million (a 37% increase) and the number of outstanding shares of preferred stock from 136,100,000 to 152,850,000 (a 12% increase).

### III. CaaStle's Board of Directors Learned Of Hunsicker's Deception and the Scheme Ultimately Unraveled

109. Hunsicker's scheme was ultimately uncovered by an investor who had reviewed CaaStle's purported "final" Fiscal Year 2023 audit report in Hunsicker's office on October 30, 2024. After noticing that the report was missing a page and appeared to contain other errors that Hunsicker was unable to explain, the investor asked Hunsicker for a contact at AUDITOR 1, the audit firm whose signature was on the report.

110. The investor contacted AUDITOR 1 and was told that AUDITOR 1 did not conduct the at-issue audit and that CaaStle was not an active client.

111. The investor told Hunsicker of its call with AUDITOR 1 and asked for an explanation. Hunsicker's response came days later. She acknowledged, without specifying the details, that there was "a problem," and she gave the investor two options: (i) do nothing and give Hunsicker time to "fix" the issue because there was "value" in the company or (ii) redeem their shares. The investor chose neither option and instead reported Hunsicker to CaaStle's Board of Directors.

112. Hunsicker resigned from CaaStle's Board of Directors on December 14, 2024, after admitting to her co-founder and a Board member that she provided false financial information to investors.

113. Hunsicker was allowed to remain as CaaStle's CEO while the Board conducted a further investigation, but during that time, restrictions were placed on her authority. She was prohibited from, among other things, raising capital for CaaStle or communicating with investors on CaaStle's behalf. Any action she took required Board approval.

114.     While the Board undertook its investigation, investors were not notified of Hunsicker's departure from the Board or made aware of the concerns that an investor had raised with the Board.

115.     Between December 14, 2024 and March 24, 2025, Hunsicker circumvented the Board's restrictions and took advantage of the fact that investors remained unaware of her wrongdoing, sold or purported to sell her own shares of CaaStle stock to existing investors in secondary transactions.

116.     On or about December 30, 2024, Hunsicker entered into an agreement with a large existing investor in which she purported to sell some or all of her personal shares. The agreement was not documented in writing and Hunsicker asked the investor to wire the funds to her personal bank account, not CaaStle. Between January 9, 2025 and January 22, 2025, the investor wired $9,625,000 to Hunsicker's personal bank account. The investor was not aware that every financial statement that Hunsicker had ever provided to them was materially false.

117.     A few weeks later, in February 2025, Hunsicker approached another investor and offered to sell the investor 9,300,000 shares of her preferred and common stock at a price of $2.15 per share. The investor was interested and, as part of its due diligence, asked Hunsicker for a copy of the final fiscal 2023 audit report and cap table. On March 11, 2025, Hunsicker provided the investor with the same fake fiscal 2023 audit that she had provided to investors in 2024, which led to her resignation from the Board. The investor noticed a number of errors and inconsistencies in the audit report and did not go through with the transaction.

118.     On or about March 18, 2025, Hunsicker provided another investor with a document that purported to be CaaStle's income statement for the fiscal year ended September 30, 2024 ("Fiscal Year 2024"), which reflected revenue of more than $848 million and losses of

approximately $192.2 million for the fiscal year. These numbers were materially false and had no basis in reality. CaaStle's internal records show fiscal 2024 revenues of approximately $11.3 million and losses of approximately $69 million.

119. Hunsicker formally resigned as CaaStle's CEO on March 24, 2025.

120. On March 25, 2025, the Board of Directors started to inform investors. In a letter to investors dated March 29, 2025, the Board notified investors that Hunsicker had stepped down as CEO and as a Director, and acknowledged that the company's "performance to date has not matched what Hunsicker claimed." The letter further stated that it learned that "[Hunsicker] provided certain investors with misstated financial statements and falsified audit opinions, as well as capitalization information that understated the number of shares outstanding." The letter advised investors not to rely on any financial or capitalization information received from Hunsicker in the past and it attached CaaStle's true fiscal 2022 and 2023 audit report.

## FIRST CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder

121. The Commission re-alleges and incorporates by reference here the allegations in Paragraphs 1 through 120.

122. Hunsicker, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, knowingly or recklessly (1) employed one or more devices, schemes, or artifices to defraud, (2) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

123.    By reason of the foregoing, Hunsicker, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act § 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)

124.    The SEC re-alleges and incorporates by reference here the allegations in Paragraphs 1 through 120.

125.    Hunsicker, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly employed one or more devices, schemes, or artifices to defraud, (2) knowingly, recklessly, or negligently obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently engaged in one or more transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchaser.

126.    By reason of the foregoing, Hunsicker, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Securities Act § 17(a) [15 U.S.C. § 77q(a)].

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court enter a Final Judgment:

## I.
### Violations

127.    Finding that Hunsicker violated the federal securities statutes and rules set forth in the Claims for Relief;

## II.
## Permanent Injunction

Permanently enjoining Hunsicker from directly or indirectly violating Exchange Act § 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Securities Act § 17(a) [15 U.S.C. § 77q(a)], pursuant to Exchange Act § 21(d) [15 U.S.C. § 78u(d)] and Securities Act § 20(b) [15 U.S.C. § 77t(b)];

## III.
## Disgorgement and Prejudgment Interest

Ordering Hunsicker to disgorge all ill-gotten gains received as a result of her unlawful conduct, plus prejudgment interest, pursuant to Exchange Act §§ 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5), 78u(d)(7)];

## IV.
## Civil Penalties

Ordering Hunsicker to pay civil money penalties pursuant to Exchange Act § 21(d)(3) [15 U.S.C. § 78u(d)(3)] and Securities Act § 20(d)(2) [15 U.S.C. § 77t(d)(2)];

## V.
## Officer and Director Bar

Pursuant to Exchange Act § 21(d)(2) [15 U.S.C. § 78u(d)(2)] and Securities Act § 20(e) [15 U.S.C. § 77t(e)], permanently prohibiting Hunsicker from acting as an officer or director of any issuer having a class of securities registered with the SEC pursuant to Exchange Act § 12 [15 U.S.C. § 78*l*] or that is required to file reports under Exchange Act § 15(d) [15 U.S.C. § 78o(d)];

## VI.
## Conduct-Based Injunction

Pursuant to Exchange Act §§ 21(d)(1) and 21(d)(5) [15 U.S.C. §§ 78u(3)(1), 78u(d)(5)] and Securities Act § 20(b) [15 U.S.C. § 77t(b)], permanently prohibiting Hunsicker from participating, directly or indirectly—including but not limited to, through any entity controlled by

her—in the issuance, offer, or sale of any security, provided, however, that such injunction shall not prevent her from purchasing or selling securities listed on a national securities exchange for her own personal account; and

## VII.
## Other Relief

Granting such other and further relief as the Court deems just, equitable, appropriate or necessary for the protection of investors.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the SEC demands a jury trial on all issues so triable.

Dated: July 18, 2025                 Respectfully submitted:

SECURITIES AND EXCHANGE COMMISSION

*/s/Suzanne J. Romajas*
Suzanne J. Romajas
Matthew T. Spitzer (*pro hac* motion pending)
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549
(202) 551-4473 (Romajas)
(202) 551-4777 (Spitzer)
RomajasS@sec.gov
SpitzerM@sec.gov

*Attorneys for Plaintiff*
*Securities and Exchange Commission*